## UNITED STATES COURT OF INTERNATIONAL TRADE

STEEL DYNAMICS, INC. AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant.*

**Case No. 26-00755**

## COMPLAINT

Steel Dynamics, Inc. ("SDI") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the "USW") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby allege and state as follows:

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1.      Plaintiffs contest certain aspects of the final determination issued by the U.S. Department of Commerce ("Commerce") in its antidumping duty ("AD") investigation of certain corrosion-resistant steel products ("CORE") from the Republic of Turkey. The final determination was published by Commerce in the Federal Register as *Certain Corrosion-Resistant Steel Products From the Republic of Turkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42,216 (Dep't Commerce Aug. 29, 2025). The findings and conclusions of the contested determination are set forth in the accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Turkiye*,

Inv. No. A-489-855 (Aug. 25, 2025).

## JURSIDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). That section confers on the U.S. Court of International Trade jurisdiction to review final determinations issued by Commerce under Section 516A(a)(2)(A)(i)(II) and (a)(2)(B)(i) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i).

## STANDING

3. SDI is a manufacturer of the domestic like product in the United States, and the USW is a certified union of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of the domestic like product. Plaintiffs are therefore interested parties within the meaning of 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(C) and (D). Plaintiffs were among the petitioners in the AD investigation which resulted in the contested determination that is the subject of this appeal. Accordingly, Plaintiffs have standing pursuant to 19 U.S.C. § 1516a(d) as parties to the proceeding in connection with which this Complaint arises and are entitled to commence this action pursuant to 28 U.S.C. § 2631(c).

## TIMELINESS OF ACTION

4. Section 516A(a)(2)(A)(i)(II) of the Act requires that, in actions challenging Commerce's determinations described in Section 516A(a)(2)(B)(i), the summons must be filed within thirty (30) days of the date of publication in the Federal Register of the AD order based upon the contested determination, and the complaint must be filed within thirty (30) days thereafter. *See* 19 U.S.C. § 1516a(a)(2)(A)(i)(II). On January 20, 2026, within thirty (30) days of the publication of the AD order on December 19, 2025, Plaintiffs filed a summons with this

Court. Plaintiffs are filing this Complaint in accordance with the Rules of this Court and within the time specified in Section 516A(a)(2)(A)(i)(II) of the Act. *See* U.S. Court of International Trade Rules 3(a) and 6(a)(1); *see also* 28 U.S.C. § 2636(c). Thus, this action is timely brought.

## STANDARD OF REVIEW

5.      This Court reviews final determinations issued by Commerce pursuant to 19 U.S.C. § 1673d to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## HISTORY OF THE ADMINISTRATIVE PROCEEDING

6.      On September 5, 2024, SDI and the USW, along with three other entities, filed an AD petition concerning unfairly traded imports of CORE from Turkey. Petitioners alleged that CORE imported from Turkey was being or was likely to be sold at less than fair value within the meaning of Section 731 of the Act (19 U.S.C. § 1673) and that these unfairly traded imports were materially injuring the U.S. domestic industry producing CORE and threatened to cause further material injury. Petitioners requested that Commerce initiate an AD investigation on CORE from Turkey and ultimately calculate a dumping margin and assign duties to remedy the dumping.

7.      On September 25, 2024, Commerce initiated an AD investigation into imports of CORE from Turkey. *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 80,196 (Dep't Commerce Oct. 2, 2024).

8.      On October 23, 2024, Commerce selected Borcelik Celik Sanayii Ticaret AS ("Borcelik") and Yildiz Demir Celik Sanayi A.S. ("YDC") as the mandatory respondents in the

AD investigation.

9. On April 10, 2025, Commerce published in the Federal Register its preliminary affirmative determination in the AD investigation of CORE from Turkey. *See Certain Corrosion-Resistant Steel Products From the Republic of Turkiye: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 Fed. Reg. 15,340 (Dep't Commerce Apr. 10, 2025) ("*Preliminary Determination*"). Commerce set forth its preliminary findings and conclusions in the accompanying *Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Turkiye* (Apr. 3, 2025) ("Preliminary Decision Memorandum"). In its *Preliminary Determination*, Commerce calculated the following dumping margins: 0.00 percent for Borcelik; 15.18 percent for YDC; and 15.18 percent for all other Turkish producers or exporters.

10. On May 9, 2025, Commerce published in the Federal Register its amended preliminary affirmative determination in the AD investigation of CORE from Turkey addressing certain ministerial errors in its *Preliminary Determination*. *See Certain Corrosion-Resistant Steel Products From the Republic of Turkiye: Amended Preliminary Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 19,677 (Dep't Commerce May 9, 2025) ("*Amended Preliminary Determination*"). Commerce set forth its amended preliminary findings and conclusions in the accompanying *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Turkiye - Analysis of Ministerial Error Allegation* (May 5, 2025) ("Ministerial Error Memorandum"). Commerce calculated the following dumping margins in the *Amended Preliminary Determination*: 2.04 percent for Borcelik; 15.18 percent for YDC; and

8.61 percent for all other Turkish producers or exporters.

11.     On July 16, 2025, Commerce issued a post-preliminary affirmative determination in the AD investigation of CORE from Turkey addressing changes to its differential pricing analysis. Commerce set forth its post-preliminary findings and conclusions in the *Decision Memorandum for the Post-Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Turkiye* (July 16, 2025) ("Post-Preliminary Decision Memorandum"). Commerce calculated the following dumping margins in the Post-Preliminary Decision Memorandum: 3.30 percent for Borcelik; 15.18 percent for YDC; and 9.24 percent for all other parties.

12.     Between April 14 and 18, 2025, Commerce verified the sales information reported in the questionnaire responses submitted by YDC. Between May 6 and 10, 2025, Commerce verified the sales information reported in the questionnaire responses submitted by Borcelik. On May 27, 2025, Commerce issued its sales verification report pertaining to YDC. *See* Verification of the Sales Response of YDC in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye (May 27, 2025) ("YDC Sales Verification Report"). On July 8, 2025, Commerce issued its sales verification report pertaining to Borcelik. *See* Verification of the Sales Response of Borcelik in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye (July 8, 2025) ("Borcelik Sales Verification Report").

13.     Between May 13 and 16, 2025, Commerce verified the cost information reported in the questionnaire responses submitted by YDC. Between May 19 and 23, 2025, Commerce verified the cost information reported in the questionnaire responses submitted by Borcelik. On July 7, 2025, Commerce issued its cost verification report pertaining to Borcelik. *See*

Verification of the Cost Responses of Borcelik Celik Sanayii Ticaret A.S in the Less-Than-Fair-Value Investigation of Corrosion-Resistant Steel Products from the Republic of Türkiye. (July 7, 2025) ("Borcelik Cost Verification Report"). On July 9, 2025, Commerce issued its cost verification report pertaining to YDC. *See* Verification of the Cost Response of Yildiz Demir Celik Sanayi A.S. and Yildiz Entegre Agac Sanayi ve Ticaret A.S. in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye (July 9, 2025) ("YDC Cost Verification Report").

14.    On July 22, 2025, Petitioners filed an affirmative case brief pertaining to the sales information submitted by Borcelik and YDC. *See* Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Petitioners' Case Brief Regarding Sales Issues (July 22, 2025) ("Petitioners' Sales Case Brief"). On July 29, 2025, Petitioners filed a rebuttal brief pertaining to the sales information submitted by Borcelik and YDC. *See* Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Petitioners' Rebuttal Brief Regarding Sales Issues (July 29, 2025) ("Petitioners' Sales Rebuttal Brief").

15.    On July 18, 2025, Petitioners filed an affirmative case brief pertaining to the cost information submitted by Borcelik and YDC. *See* Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Petitioners' Case Brief Regarding Cost Issues (July 18, 2025) ("Petitioners' Cost Case Brief"). On July 24, 2025, Petitioners filed a rebuttal brief pertaining to the cost information submitted by Borcelik and YDC. *See* Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Petitioners' Rebuttal Brief Regarding Cost Issues (July 24, 2025) ("Petitioners' Cost Rebuttal Brief").

16.    On July 24, 2025, Petitioners filed a letter in lieu of a case brief pertaining to Commerce's Post-Preliminary Decision Memorandum. *See* Less-Than-Fair-Value Investigation

of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Petitioners' Letter in Lieu of Post-Preliminary Determination Case Brief (July 24, 2025) ("Petitioners' Letter in Lieu of Post-Preliminary Determination Case Brief").

17.    On August 29, 2025, Commerce published in the Federal Register its final affirmative determination in the AD investigation of CORE from Turkey. *See Certain Corrosion-Resistant Steel Products From the Republic of Türkiye: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 42,216 (Dep't Commerce Aug. 29, 2025) ("*Final Determination*"). Commerce set forth its final findings and conclusions in the accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Türkiye* (Aug. 25, 2025) ("Issues and Decision Memorandum"). Commerce calculated the following dumping margins in the *Final Determination*: 6.48 percent for Borcelik; 10.49 percent for YDC; and 8.06 percent for all other Turkish producers or exporters.

18.    On December 19, 2025, based on the final affirmative AD determination, Commerce published the AD order on CORE from Turkey. *See Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed. Reg. 59,494 (Dep't Commerce Dec. 19, 2025).

# STATEMENT OF CLAIMS

## COUNT ONE

19.    Plaintiffs hereby incorporate by reference paragraphs 1 through 18 of this Complaint.

20.    For the *Final Determination*, Commerce calculated Borcelik's dumping margin using the average-to-average method, which compares weighted average normal values in the home market to weighted average U.S. prices for equivalent merchandise. However, when Commerce applied this comparison method, it allowed U.S. sales made above normal value to "offset" U.S. sales made below normal value. *See Issues and Decision Memorandum* at Comment 18. This lowered Borcelik's dumping margin by partially cancelling out the effect of its dumped sales.

21.    This is contrary to law. Under the antidumping statute, Commerce may not calculate dumping margins using sales made above normal value. It must "zero" these non-dumped sales by treating them as creating no, or zero, dumping margins. Commerce may only calculate dumping margins on the basis of sales that are made below normal value.

22.    In Petitioners' Sales Case Brief, Petitioners explained that Commerce should apply zeroing to all sales comparisons and treat all non-dumped sales as having zero dumping margins. *See* Petitioners' Sales Case Brief at 4-18. Similarly, in Petitioners' Letter in Lieu of Post-Preliminary Determination Case Brief, Petitioners explained that "regardless of which comparison method is used, Commerce should apply the zeroing methodology to all sales comparisons and treat all non-dumped sales as having zero dumping margins for purposes of calculating the mandatory respondents' weighted-average dumping margins." *See* Petitioners' Letter in Lieu of Post-Preliminary Determination Case Brief at 2.

23.     Commerce's decision not to zero non-dumped sales and to offset dumped sales with non-dumped sales is unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT TWO

24.     Plaintiffs hereby incorporate by reference paragraphs 1 through 23 of this Complaint.

25.     During verification, Commerce found that Borcelik's reported home market freight expenses were based on quoted prices and quantities that differed from its actual prices and quantities. Borcelik attempted to correct its error at verification, but because the proposed change was not minor, Commerce did not accept it. Accordingly, the record did not contain the correct value of Borcelik's freight expenses.

26.     Petitioners' Sales Case Brief described Borcelik's reporting failure and demonstrated that the record required the use of facts otherwise available with an adverse inference ("AFA") to calculate Borcelik's freight expenses. As Petitioners explained, the use of AFA had to ensure that Borcelik would not benefit from its failure to cooperate to the best of its ability with Commerce's requests for information. Petitioners advised Commerce that they had "tested various partial AFA adjustments relating to the expense categories that Borcelik misreported and found that none accomplish the statutory purpose of deterring Borcelik's non-cooperation." *See* Petitioners' Sales Case Brief at 27. Therefore, Petitioners requested that Commerce "increase the gross unit price applicable to Borcelik's home market sales by 5 percent." *Id.* at 26.

27.     In the *Final Determination*, Commerce agreed with Petitioners' argument that Borcelik's reporting failure created a gap in the record, requiring the use of facts otherwise

available to calculate Borcelik's freight expenses. *See* Issues and Decision Memorandum at Comment 3. Moreover, Commerce agreed that, because Borcelik did not cooperate to the best of its ability with Commerce's requests for information, an adverse inference should be applied in selecting the facts otherwise available. *Id.*

28.    However, Commerce stated that it "{did} not agree…with the petitioners' proposed methodology of modifying the gross unit price by an arbitrary amount." *Id.* Instead, Commerce used the lowest reported inland freight expense on the record for the relevant destination as facts available. *Id.*

29.    As a result of Commerce's choice of facts available, Borcelik's dumping margin went down, not up. This was because Commerce's so-called "adverse" adjustment reduced the number of Borcelik's home market sales that were below cost, which incorporated new sales into Commerce's dumping margin calculations and lowered the dumping margin. Regardless of the methodology, the effect of Commerce's adjustment was clear: Borcelik benefited from its non-cooperation. This is contrary to law, which requires that adjustments made pursuant to 19 U.S.C. § 1677e(b) be adverse to respondents rather than beneficial. Commerce's application of AFA was therefore unsupported by substantial evidence and otherwise not in accordance with law.

30.    Further, because the choice that Commerce made in the *Final Determination* did not bear a relation to the facts found during verification, Commerce's decision was arbitrary and capricious.

## COUNT THREE

31.    Plaintiffs hereby incorporate by reference paragraphs 1 through 30 of this Complaint.

32.    As part of Commerce's verification of Borcelik's costs, Borcelik submitted a cost

reconciliation that included an improper deduction. Specifically, when adjusting from finished goods cost of sales to finished goods cost of manufacture, Borcelik deducted net internal stock transfers from its finished goods inventory balance. This resulted in an incomplete finished goods inventory figure. Stock transfers are finished goods moved between divisions and warehouses and thus are a part of finished goods inventory and should not have been deducted.

33.     Petitioners' Cost Case Brief alerted Commerce to this error. *See* Petitioners' Cost Case Brief at 21. However, Commerce declined to remove the internal stock transfer adjustment. See Issues and Decision Memorandum at Comment 8. As a result, Borcelik's cost of manufacture was improperly reduced, lowering its dumping margin.

34.     Commerce's decision to retain Borcelik's improper deduction of internal stock transfers from its finished goods inventory balance is unsupported by substantial evidence and otherwise not in accordance with law.

### COUNT FOUR

35.     Plaintiffs hereby incorporate by reference paragraphs 1 through 34 of this Complaint.

36.     YDC improperly included the costs and production quantities of its semi-finished goods ("SFG") in its cost database despite the fact that these products were further processed into finished merchandise, leading to a fundamental distortion of YDC's reported cost of production and constructed value data. By including SFG, *i.e.*, products that were still in process and not independently sold or reported as final products, YDC artificially inflated its reported production quantities. This distortion not only overstated total production but also skewed the weight-averaging of costs used to derive annual average costs for each control number

("CONNUM").

37.    At verification, Commerce attempted to substantiate the effect of including SFG in the cost database. The distortion caused by YDC's inclusion of SFG manifests in two interconnected ways. First, when the production quantity of SFG is overstated, their cost contribution is improperly amplified in the weighted average, skewing the resulting CONNUM-specific cost. Second, the issue is further magnified under Commerce's high-inflation methodology, which relies on accurate monthly reporting of production quantities and per-unit costs.

38.    In the YDC Cost Verification Report, Commerce stated that "both the quantity and per unit costs" of the SFG "were included in the CONNUM cost buildup; therefore, there was not an overreporting of production quantities with no associated costs reported." *See* YDC Cost Verification Report at 7. However, the conclusion that no costless quantity was reported because both the quantities and costs of SFG were included in the cost buildup misses the point. The problem is not the underreporting of cost but the misallocation of cost across time and product categories. In a high-inflation environment, accurately matching monthly production quantities with the corresponding per-unit costs is essential.

39.    Petitioners explained this issue at length in Petitioners' Cost Case Brief. *See* Petitioners' Cost Case Brief at 23-32. Indeed, Petitioners demonstrated that improper production quantity weighting materially distorts reported costs. *Id*. at 27.

40.    In its *Final Determination*, Commerce rejected Petitioners' argument that the application of total AFA was warranted with respect to YDC due to its failure to accurately report its costs. *See* Issues and Decision Memorandum at Comment 11. Commerce found that "YDC appropriately included the production quantities and costs of SFG in its cost database

because the SFG included merchandise under consideration (MUC) that was salable and, in some cases, was in fact sold." *Id.* Commerce's decision is based on three findings: (1) some SFG was merchandise under consideration and was sometimes sold; (2) YDC could not isolate the net production quantities of finished goods; and (3) inclusion of SFG in YDC's cost database does not distort YDC's reported costs. *Id.*

41.     Commerce's findings are unsupported by the record, and its decision in the *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT FIVE

42.     Plaintiffs hereby incorporate by reference paragraphs 1 through 41 of this Complaint.

43.     In its *Preliminary Determination*, Commerce used the earlier of invoice date or shipment date as the date of sale for YDC's home market sales. *See* Preliminary Decision Memorandum at 12. For YDC's U.S. sales, Commerce used the date of the proforma invoice "because YDC demonstrated that it does not revise the order information after the proforma invoice is issued and the proforma invoice is issued prior to the shipment of the subject merchandise." *Id.*

44.     Throughout the investigation, YDC consistently maintained that the proforma invoice reflected the final terms of sale for its U.S. sales and was thus the appropriate document on which to base the date of sale. *See* Petitioners' Sales Rebuttal Brief at 22. YDC's repeated assertions that the proforma invoice governed the transaction terms foreclosed any further inquiry by Commerce into the commercial invoice, and Commerce reasonably relied on YDC's representations in its *Preliminary Determination*. However, in its sales case brief, for the first time, YDC reversed course and argued that Commerce should instead rely on the commercial

invoice date. *See* Case Brief of YDC (Sales Issues) (July 22, 2025) at 17-29.  In Petitioners'

Sales Rebuttal Brief, Petitioners agreed with Commerce's decision to use the proforma invoice

date as the date of sale for YDC's U.S. sales. *See* Petitioners' Sales Rebuttal Brief at 22-27.

45.     In its *Final Determination*, Commerce reversed its reliance on the proforma

invoice date and adopted the earlier of the commercial invoice or shipment date as the date of

sale for YDC's U.S. sales. *See* Issues and Decision Memorandum at Comment 13. Commerce

based its decision on what appears to be at most one verified example of a post proforma change

that Commerce deemed to be material, *i.e.*, a change to tolerance level. Even accepting that

tolerance level can be a material term, it is arbitrary to treat a single instance as sufficient to

discard the proforma invoice date across the board – especially where Commerce simultaneously

stated that many of YDC's alleged proforma changes were not material and in light of the fact

that YDC argued throughout nearly the entirety of the investigation until well after the factual

record had closed that there were no material changes to its U.S. sales after the issuance of the

proforma invoice.

46.     Commerce's decision to rely on the commercial invoice date to identify the earlier

of the invoice or shipment date as the date of sale for YDC's U.S. sales is unsupported by

substantial evidence and otherwise not in accordance with law.

## COUNT SIX

47.     Plaintiffs hereby incorporate by reference paragraphs 1 through 46 of this

Complaint.

48.     In Petitioners' Cost Case Brief, Petitioners argued that Commerce should adjust

YDC's reported depreciation expense to reflect the loss of purchasing power for each month

because of YDC's failure to demonstrate when it last revalued its fixed assets for inflation. *See*

Petitioners' Cost Case Brief at 36-39. Petitioners explained that costs are normally calculated based on the records of the exporter or producer if such records are kept in accordance with the generally accepted accounting principles ("GAAP") of the exporting or producing country and reasonably reflect the costs associated with the production and sale of the merchandise. *Id.* at 37. Furthermore, although the depreciation expense reported by YDC was based on its accounting records prepared in accordance with Turkish GAAP, YDC relied on fixed asset values from several years prior to the start of the period of investigation ("POI") and the exact time frame of those values was unknown. *Id.* Moreover, Turkey has experienced significant inflation for many years, including in the years preceding the POI, and because YDC's fixed asset values were based on historical lira figures, they did not reflect current inflation-adjusted currency values and were significantly understated. *Id.* at 37-38.

49.    In its *Final Determination*, Commerce determined not to adjust YDC's reported depreciation expense to account for the effects of inflation on fixed assets. *See* Issues and Decision Memorandum at Comment 12. Commerce explained that YDC had revalued its fixed assets every quarter since December 2021, including during the POI, in accordance with the regulations governing revaluation. *Id.* As a result, it concluded that Petitioners' proposal to index the depreciation expenses calculated on fixed assets from several years prior to the date of the POI would inflate depreciation expenses that are already inflated in YDC's normal books and records. Commerce's conclusion rests almost entirely on YDC's unsupported assertion that its fixed assets were revalued quarterly since 2021. However, Commerce acknowledged that no revaluation schedules exist and that YDC could not show what assets were revalued or how those revaluations flowed into depreciation.

50.    Commerce accepted depreciation adjustments that it was unable to verify, even

though depreciation is a derived expense that depends entirely on the underlying asset base. Commerce's acceptance of YDC's depreciation violates the substantial evidence standard because Commerce relied on undocumented asset revaluations and failed to explain how the reported depreciation reasonably reflects current costs in a high-inflation environment.

51.     Commerce's decision not to adjust YDC's reported depreciation expense to account for the effects of inflation on fixed assets is unsupported by substantial evidence and otherwise not in accordance with law.

## REQUEST FOR JUDGMENT AND RELIEF

52.     Wherefore, Plaintiffs respectfully request that this Court:

   a.   hold and declare that the aspects of Commerce's *Final Determination* challenged herein are unsupported by substantial evidence on the record or otherwise not in accordance with law and are arbitrary and capricious;

   b.   remand this case to Commerce for disposition consistent with the decision of this Court; and

   c.   provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

 /s/ Jeffrey D. Gerrish
Roger B. Schagrin
Jeffrey D. Gerrish
Maliha Khan
Nicholas C. Phillips

**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc. and
United Steel, Paper and Forestry,
Rubber, Manufacturing, Energy,
Allied Industrial and Service
Workers International Union, AFL-
CIO, CLC*

Dated: February 19, 2026

# UNITED STATES COURT OF INTERNATIONAL TRADE

*Steel Dynamics, Inc. and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC v. United States*
**Court No. 26-00755**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, pursuant to USCIT Rule 3(f), a copy of the foregoing Complaint was served on February 19, 2026, via certified mail, return receipt requested, or by international mail as indicated by asterisk (*), on the following parties:

Attorney-in-Charge
International Trade Field Office
Commercial Litigation Branch
**U.S. Department of Justice**
26 Federal Plaza, Rm. 346
New York, N.Y. 10278

Jeanne E. Davidson
Civil Division
Director of Commercial Litigation Branch
**U.S. Department of Justice**
1100 L Street, NW
Washington, D.C. 20530

Robert Heilferty, Chief Counsel
Office of the Chief Counsel for Trade
Enforcement & Compliance
**U.S. Department of Commerce**
14th and Constitution Avenue, NW
Room 3622
Washington, DC 20230

Pierre Gentin, General Counsel
**U.S. Department of Commerce**
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Stephanie M. Bell, Esq.
**Wiley Rein LLP**
2050 M Street, NW
Washington, DC 20036
sbell@wiley.law

Thomas M. Beline, Esq.
**Cassidy Levy Kent (USA) LLP**
2112 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20037
tbeline@cassidylevy.com

Stephen P. Vaughn, Esq.
**King & Spalding LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
svaughn@kslaw.com

David L. Simon, Esq.
**Law Office of David L. Simon**
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
dlsimon@dlsimon.com

Bulent Hacioglu, Esq.
**Trade Resources Company**
1025 Connecticut Ave., NW, Suite 1000
Washington, DC 20036
bhacioglu@traderes.com

Leah Scarpelli, Esq.
**ArentFox Schiff LLP**
1717 K Street, NW
Washington, DC 20006
leah.scarpelli@afslaw.com

18

Atilla Ugur BASBUG*
**Government of the Republic of Turkey**
Ministry of Trade Sögütözü Mah. Nizami
Gencevi Cad. 63/1 06530 Çankaya /
ANKARA, TÜRKIYE
basbuga@ticaret.gov.tr

John Anwesen
**Lighthill PC**
300 New Jersey Avenue, NW
Suite 300
Washington, DC 20001
j.anwesen@lighthilltrade.com

Cagri Arici
**Embassy of Turkey**
2525 Massachusetts Avenue, NW
Washington, DC 20008
aricic@ticaret.gov.tr

Friederike Goergens
**Greenberg Traurig, LLP**
2101 L Street, NW
Washington, DC 20037
goergensf@gtlaw.com

/s/ Jeffrey D. Gerrish
Jeffrey D. Gerrish
SCHAGRIN ASSOCIATES